IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PROMED, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:23-CV-2023-D |
| VS. | § | |
| | § | |
| QUINTAIROS PRIETO WOOD & | § | |
| BOYER, P.A., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Following a jury trial and entry of judgment in favor of plaintiff ProMED, LLC ("ProMED"), ProMED moves for an award of attorney's fees and costs, and defendant Quintairos Prieto Wood & Boyer, P.A. ("QPWB") renews its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), and, in the alternative, moves for a new trial under Rule 59(a). For the reasons that follow, the court grants in part and denies in part QPWB's renewed motion for judgment as a matter of law; denies QPWB's alternative motion for a new trial; denies ProMED's motion for attorney's fees; and grants ProMED's motion for costs. The court enters an amended judgment in favor of ProMED in the principal sum of $62,500 in actual damages, prejudgment interest, $3,461.23 in costs (minus any taxable costs of court included in this amount), taxable costs of court, as calculated by the clerk of court, and post-judgment interest.

I

In 2020, at the height of the COVID-19 Pandemic, ProMED entered into a contract ("ProMED Contract") with non-party Luxe Development LLC ("Luxe") to procure personal protective equipment ("PPE"), i.e., latex gloves. Acting as ProMED's designated agent, Luxe entered into a contract ("Purchase Agreement") with non-party ProVantage Healthcare Solutions Inc. ("ProVantage"), the designated agent of a PPE manufacturer located in Vietnam.

On July 16, 2020 Luxe and ProVantage entered into an escrow agreement ("Escrow Agreement") with defendant QPWB, a law firm. Under the terms of the Escrow Agreement, Luxe was required to deposit 50% of the balance due to ProVantage into the escrow account upon execution of the Escrow Agreement and deposit the remaining 50% after it received the bill of lading. Regarding the disbursement of funds, the Escrow Agreement provided:

> Upon [QPWB]'s receipt of consistent written instructions from both [ProVantage] and [Luxe], [QPWB] will disburse the Escrowed Funds in accordance with such instructions. . . . Notwithstanding the foregoing provisions . . . , in the event that [ProVantage] or [Luxe] provides [QPWB] and the other party with a written certification claiming the Escrowed Funds pursuant to certain provisions of the Purchase Agreement, [QPWB], in its absolute and sole discretion, may elect to proceed by:
>
> (i) notifying [Luxe and ProVantage] that it intends to disburse the Escrowed Funds in accordance with such request unless the non-requesting party delivers a written objection to such requested disbursement within twelve (12) hours after receipt of said notice, and
>
> (ii) so disbursing the Escrowed Funds to the requesting party

- 2 -

> after such 12-hour period, provided the non-requesting party has
> not objected to such disbursement[.]

P. Ex. 2 at 2.  The Escrow Agreement also stated in ¶ 5 that "[QPWB] will be entitled to rely

upon the instructions and other matters covered thereby, and will not be required to

investigate the authority of the person executing and delivering such instructions, or

otherwise verify the accuracy of the statements or information presented therein." *Id.*  And

in ¶ 6 the Escrow Agreement provided that QPWB would not be liable "for any losses, costs

or damages it may incur in performing its responsibilities hereunder unless such losses, costs

or damages arise out of the willful default or gross negligence of [QPWB] or its agents." *Id.*

Luxe deposited the initial sum of $475,000 into the escrow account on July 28, 2020.

On July 31, 2020, at the direction of ProVantage's agent, Charlene Russo ("Russo"), QPWB

wired the sum of $95,000 out of the escrow account to T-R Construction Import Export ("T-

R Construction").  On August 19, 2020, after Luxe received a bill of lading, it deposited the

remaining balance ($475,000) into the escrow account.[1]  That same day, at the direction of

Russo, QPWB wired the sum of $348,750 out of the escrow account to T-R Construction.

On August 31, 2020 QPWB wired the sum of $443,750 out of the escrow account to T-R

Construction, again at the direction of Russo.

Luxe was unaware of the July 31, 2020, August 19, 2020, and August 31, 2020 wire

transfers (collectively, the "T-R Transfers").  In fact, Luxe did not know that any of the

escrowed funds had been disbursed until November 10, 2020, when QPWB informed Luxe

---

[1]Luxe later discovered that the bill of lading was "fictitious."  Tr. 1:127:20-22.

of its intent to disburse the remaining funds to itself, as paymaster, and to ProVantage and its business partners.  In a November 10, 2020 email, Luxe's attorney stated the following to QPWB:

> [t]his matter has not been resolved and the terms of the escrow agreement have not been followed.  [Luxe] and the parties that are beneficiaries to the escrow agreement have not completed the transaction as required, and in fact [ProVantage] is in breach of their agreement with [Luxe].  We request that you immediately cease any attempts to transfer any funds related to this transaction and provide my office with a full accounting of all funds being held by your firm.

P. Ex. 19.  On January 11, 2021 Luxe's counsel sent a second email that stated:

> [p]er our last telephone conversation you stated that you would send me proof of my client's communication to your firm—for the release of the funds being held in escrow.  To date I have not received that information.  My client does not agree to release any funds to your firm or any other party at this time.  Again, we are requesting evidence of the written confirmation by [Luxe] representatives to [QPWB] per the escrow agreement executed by the parties.

P. Ex. 12.

Despite these email communications, QPWB, on February 26, 2021, disbursed the sum of $4,750 from the escrow account to pay itself as paymaster for serving as the escrow agent.  And on April 7, 2021, at the direction of ProVantage, QPWB wired the balance of the escrowed funds, the sum of $57,750, to Advanced Healthcare Solutions, LLC.  QPWB did not obtain prior written instructions from Luxe for any of these disbursements: it disbursed the funds at the unilateral direction of Russo, and it did not notify Luxe before making the disbursements.

- 4 -

Unbeknownst to QPWB, the PPE that was the subject of the ProMED Contract and Purchase Agreement was never delivered to ProMED. Accordingly, on January 11, 2022 ProMED sued Luxe and Luxe's CEO, Michelle Reulet ("Reulet"), in state court for breach of the ProMED Contract and fraud. ProMED and Reulet eventually entered into a settlement agreement under which Reulet and Luxe assigned to ProMED all of their contract claims against QPWB and ProVantage. On August 2, 2023 ProMED brought the instant lawsuit in Texas state court against QPWB for breach of contract based on QPWB's alleged breach of the Escrow Agreement. The case was removed to this court.

The case was then tried to a jury, which returned a verdict in ProMED's favor, finding that ProMED was entitled to recover the sum of $900,000 from QPWB. The court entered judgment on the verdict for actual damages and also awarded prejudgment interest,[2] attorney's fees, non-taxable costs, taxable costs of court, and post-judgment interest.

ProMED now moves for an award of attorney's fees and costs. QPWB renews its motion for judgment as a matter of law, and, in the alternative, moves for a new trial. The motions are opposed. The court has heard oral argument.

---

[2]In a memorandum that accompanied the judgment, the court explained that, in accordance with Alabama law, it was awarding prejudgment interest at the rate of 6% per annum, commencing on July 31, 2020 (the date QPWB breached the Escrow Agreement). Based on today's decision, the court is commencing the accrual of prejudgment interest on February 26, 2021.

II

The court begins with QPWB's renewed motion for judgment as a matter of law and alternative motion for new trial.

A

"A motion for judgment as a matter of law 'challenges the legal sufficiency of the evidence to support the verdict.'" *Jacobs v. Tapscott*, 516 F.Supp.2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quoting *Hodges v. Mack Trucks, Inc*., 474 F.3d 188, 195 (5th Cir. 2006)), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

> Judgment as a matter of law is appropriate with respect to an issue if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on that issue. This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict. In considering a Rule 50 motion, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weigh the evidence, as those are jury functions. In reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Id*. (quoting *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004)). The court will "uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable [jurors] could not arrive at any verdict to the contrary." *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1039 (5th Cir. 2011)

(alteration in original) (quoting *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)).  "In other words, the 'jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'"  *Id.* at 1039-40 (quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)).

B

The court "has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so 'to prevent an injustice.'"  *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 1867292, at *9 (N.D. Tex. Aug. 5, 2005) (Fitzwater, J.) (quoting *Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 774 (5th Cir. 1995)), *aff'd*, 2007 WL 3085028 (5th Cir. Oct. 23, 2007).  A new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Rule 59(a)(1)(A).  Rule 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict."  *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).  For example, a new trial may be granted if the court concludes that the verdict is against the weight of the evidence, that the trial was unfair, or that prejudicial error was committed in the course of the trial.  *See id.* at 613.  For the verdict to be against the great weight of the evidence, "the movant must show 'an absolute absence of evidence to support the jury's verdict.'"  *Siebert v. Jackson Cnty., Miss.*, 851 F.3d 430, 439 (5th Cir. 2017) (quoting *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998)).

III

A

QPWB first contends that the court should render judgment as a matter of law because ProMED failed to present expert testimony regarding QPWB's duties as escrow officer, QPWB's deficiencies in performing its duties, the standard of care imposed upon an escrow officer, or the heightened standard of care required by the terms of the Escrow Agreement.[3] QPWB relies primarily on *Watson, Watson, Rutland/Architects, Inc. v. Montgomery County Board of Education*, 559 So.2d 168 (Ala. 1990), to argue that expert testimony was required in this case because escrow officers are members of a profession that requires specialized knowledge, breach of the Escrow Agreement was not so obvious that any reasonable person would see it, and the nature and extent of the duty of an escrow officer are not matters of common knowledge.[4]

Under Alabama law, "[e]xpert opinion testimony should not be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts. The opinion of the expert is inadmissible

---

[3]ProMED contends that QPWB waived this argument by raising it for the first time in its renewed motion rather than in the motion presented at trial. Because the court is denying this ground of QPWB's motion for other reasons, it will assume *arguendo* that this ground of QPWB's motion has been properly raised.

[4]QPWB also contends that expert testimony was required in this case because QPWB is a law firm acting as an escrow agent. The court disagrees. Although QPWB is a law firm, in the context of the Escrow Agreement, it was acting as an escrow agent, not an attorney.

upon matters of common knowledge." *Watson*, 559 So.2d at 174 (quoting *Wal-Mart Stores, Inc. v. White*, 476 So.2d 614, 617 (Ala. 1985)).  In *Watson*, a case involving a breach of contract claim against an architect, the Supreme Court of Alabama held that "in cases dealing with an alleged breach of a duty by an attorney, a doctor, or any other professional, *unless the breach is so obvious that any reasonable person would see it*, then expert testimony is necessary in order to establish the alleged breach." *Id*. at 173 (emphasis added); *see also LeBlanc v. Residence Dr. Home Inspection, LLC*, ___ So.3d ___, 2024 WL 4796676, at *3 (Ala. Nov. 15, 2024) ("Although this Court has not specifically addressed whether expert testimony is required to establish a home inspector's breach of the applicable standard of care, we have required expert testimony in other cases in which a party has alleged that a professional has breached the applicable standard of care, *if the breach would not be obvious to a reasonable person*." (emphasis added) (citation omitted)).

Assuming *arguendo* that QPWB's escrow services constitute services performed by a professional, there is still no requirement of expert testimony in this case.  This is because QPWB's contractual duty was clearly set out in the Escrow Agreement.  And in the context pertinent here—i.e., the two instances in which the court holds that QPWB is liable for failing to comply with the Escrow Agreement—the failure to comply is "so obvious that any reasonable person would see it." *Watson*, 559 So.2d at 173.

In its reply brief and at oral argument, QPWB relied on a Maryland case, *Roman v. Sage Title Group, LLC*, 146 A.3d 479 (Md. App. 2016), to argue that "other courts consistently conclude expert testimony is required to establish the applicable standard of care

for escrow officers." P. Reply (ECF No. 61) at 4. But *Roman* (which is not binding on this court) involved a claim for *negligence*. ProMED is suing for *breach of contract*. And although the Supreme Court of Alabama has "point[ed] out the value, and in some cases, the necessity, for expert testimony to aid the court and the trier of fact in resolving conflicts that might arise" in a contract case, *Watson*, 559 So.2d at 175, in order to determine whether QPWB breached the clear terms set out in the Escrow Agreement, the jury did not need to understand "the operation of escrow accounts [or the] standard of care a title company owes to individuals or entities who are not customers, but who deposit funds in escrow with the title company." *Roman*, 146 A.3d at 495.

The court holds that expert testimony was not required to prove the breach of a contractual duty in this case. *See, e.g.*, *Housley v. LiftOne, LLC*, 2021 WL 4197596, at *12 (N.D. Ala. Sept. 15, 2021) (holding, under Alabama law, that expert testimony was not required in contract case because "[a] failure to replace equipment taken off during a contractually obligated repair is something 'so obvious that any reasonable person would see it.'" (citation omitted)).

B

QPWB next contends that it is entitled to judgment as a matter of law because ProMED failed to introduce evidence establishing that QPWB breached the Escrow Agreement in a willful or grossly negligent manner.

1

The Escrow Agreement provides that QPWB will not be liable "for any losses, costs

or damages it may incur in performing its responsibilities hereunder unless such losses, costs or damages arise out of the willful default or gross negligence of [QPWB] or its agents." P. Ex. 2 at 2. Under Alabama law, "[s]imple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." *Scott v. ABF Freight Sys., Inc*., 306 F.Supp.2d 1169, 1176 (M.D. Ala. 2004) (quoting *Dorman v. Jackson*, 623 So.2d 1056, 1058 (Ala. 1993)). To establish wantonness, the plaintiff must prove that the defendant "consciously did some act or omitted some duty, 'while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" *Id.* (quoting *Barker v. Towns*, 747 So.2d 907, 909 (Ala. Civ. App. 1999)).

Gross negligence [under Alabama law] is "the intentional failure to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another." *Schaeffer v. Poellnitz*, 154 So.3d 979, 986 (Ala. 2014) (citations omitted).

2

QPWB contends that ProMED failed to introduce evidence that QPWB willfully defaulted on the Escrow Agreement or that any alleged breach of the Escrow Agreement was the result of gross negligence. It maintains that the "unrefuted testimony" of its Chief Financial Officer, Alan Brenner ("Brenner"), "established he did not consciously know, act, or fail to act with the conscious knowledge that doing so was a breach of the Escrow Agreement or would result in injury," D. Br. (ECF No. 57) at 15; that when Brenner disbursed funds at the instruction of Russo, he believed he was in compliance with the

- 11 -

Escrow Agreement and "further believed he was complying with the Escrow Agreement because his understanding was that Reulet and Russo 'were in constant contact about this transaction,'" *id.* at 16 (quoting Tr. 1:196-97); and that the unrefuted testimony shows that Brenner had no knowledge of danger or consciousness that sending the funds to the manufacturer, per Russo's instructions, would likely result in injury.

ProMED responds that the trial evidence establishes that QPWB's acts and omissions amounted to willful default and gross negligence. Brenner acknowledged that QPWB was not authorized to release funds without prior approval from Luxe, or at a minimum until giving Luxe an opportunity to object; QPWB disbursed the escrowed funds over the direct request of Luxe's attorney for contact and two direct objections from Luxe's attorney; and

> QPWB had direct knowledge of the danger because it was on notice that (1) ProVantage was in breach of the Purchase Agreement and (2) Luxe specifically objected to any additional disbursements of the Escrowed Funds. Further, QPWB proceeded in acting, notwithstanding the fact that it was on notice that doing so would result in injury to Luxe. Further, QPWB intentionally failed to follow the Escrow Agreement in reckless disregard of the consequences to Luxe.

P. Br. (ECF No. 60) at 11.

3

With respect to the three T-R Transfers, the jury could not have reasonably found that QPWB willfully defaulted on the Escrow Agreement or that QPWB's breach of the Escrow Agreement resulted from gross negligence.

Brenner testified that, for each of the T-R Transfers, he believed that he was acting

in compliance with the terms of the Escrow Agreement because he believed that, under ¶ 5, he was entitled to rely on Russo's instructions. He also testified that he believed that Russo and Reulet had discussed each of the T-R Transfers and assumed that Russo and Reulet were in constant contact regarding the transactions. ProMED did not present any evidence that Brenner knew at any point prior to October 8, 2020,[5] at the earliest, that in failing to obtain written instructions from Luxe or provide Luxe with notice prior to each of the transfers, injury would likely or probably result. *See Scott*, 306 F.Supp.2d at 1176. Nor did ProMED present evidence that would support the reasonable finding that Brenner recklessly disregarded the consequences of his conduct. *See Schaeffer*, 154 So.3d at 986. To the contrary, Brenner's unrefuted testimony proved that, at least with respect to the TR-Transfers, he believed that he was doing exactly what the parties wanted.

ProMED contends in its response brief that the evidence at trial established that QPWB's acts and omissions amounted to both willful default and gross negligence. But it fails to cite any evidence in the trial record that would support such a finding with respect

---

[5]In its response brief, ProMED cites emails dated November 10, 2020 and January 11, 2021 as evidence that QPWB's acts and omissions amounted to both willful default and gross negligence. But ProMED also produced evidence at trial that, on October 8, 2020, Russo forwarded Brenner an email that Luxe's attorney had sent her that stated:

> Your tortious acts must cease and desist immediately—ProVantage and its representatives do not have the authority to act on behalf of [Luxe] and [Reulet]. We have provided you with notice as to our position on this matter.

P. Ex. 11.

to the T-R Transfers. ProMED first cites a July 22, 2020 email from Luxe's attorney, Hamilton Rucker, Esq. ("Rucker"), to Brenner asking Brenner to contact him regarding Luxe's "recent[] significant wire transfer to [QPWB]." P. Ex. 10. Brenner testified that he received Rucker's email and spoke with Rucker before the first deposit was made into the escrow account.[6] But neither the July 22, 2020 email nor Brenner's trial testimony regarding this email supports the reasonable finding that Brenner's conduct with respect to the T-R Transfers was reckless or constituted a willful default of the Escrow Agreement. This is because the July 22, 2020 email and follow-up conversation with Rucker related only to the *incoming* funds. There is no evidence that Brenner and Rucker discussed procedures for disbursing funds or the potential risks associated with Brenner's disbursement of funds at the unilateral direction of Russo, i.e., without also obtaining written authorization from, or providing notice to, Luxe.

Citing a November 10, 2020 email,[7] ProMED next contends that, in response to Brenner's November 10, 2020 email notifying Reulet "of the conclusion of this transaction and to provide notice that [QPWB] will proceed to withdraw our paymaster fee," P. Ex. 19, Rucker informed Brenner "that the terms of the Escrow Agreement have not been followed, that ProVantage was in breach of the Purchase Agreement, and requested that QPWB

_____

[6]Brenner testified at trial that the reason Rucker reached out to him was because the initial wire, which was to be sent on July 22, 2020, had been sent to a different law firm.

[7]ProMED actually cites Exhibit 12, but the court assumes ProMED intends to cite Exhibit 19, which is the November 10, 2020 email that ProMED describes in its brief.

immediately cease any attempts to transfer funds related to the transaction." P. Br. (ECF No. 60) at 11 (citing P. Ex. 12; Tr. 1:46-49). Citing a January 11, 2021 email[8] sent by Rucker, ProMED also contends:

> Luxe's attorney informed QPWB that QPWB agreed to send proof of Luxe's communication to QPWB for the release of the Escrowed Funds, that QPWB had not yet done so, and that Luxe did not agree to the release of any funds [but that d]espite this, on April 6, 2021, Eric Boyer, the managing partner of QPWB, told Alan Brenner to "just wire the money left in escrow' and that he was "done with this"—without including Luxe or its attorney in the communication.

*Id.* (citations omitted). But both of these emails were sent *after* the T-R Transfers were made, and for the first time informed Brenner that Luxe had not authorized Russo to act on its behalf and that ProVantage had breached the Purchase Agreement. ProMED has not pointed to any evidence in the trial record that would permit a reasonable jury to find that Brenner knew at any point prior to the T-R Transfers that Russo was not authorized to act on behalf of Luxe or that ProVantage had breached the Purchase Agreement. Accordingly, even if the November 10, 2020 and January 11, 2021 emails constituted "red flags" that put Brenner on notice of the risk of injury associated with *future* transfers, these emails could not have put him on notice of the risk of injury with respect to the transfers that had already occurred. Based on the November 10, 2020 and January 11, 2021 emails, a reasonable jury could not have found that, when Brenner made the T-R Transfers (all three of which predate

---

[8]Luxe cites Exhibit 19, but the court assumes it intends to cite to Exhibit 12, which is the January 11, 2021 email that Luxe describes in its brief.

these two emails), he knew that injury would likely result or recklessly disregarded the consequences of his conduct.

Because a reasonable jury could not have found based on the evidence in the trial record that Brenner willfully defaulted or acted with gross negligence with respect to the T-R Transfers, the court grants QPWB's renewed motion for judgment as a matter of law with respect to these transfers.

4

A reasonable jury *could* have found, however, with respect to the remaining two transfers (i.e., the February 26, 2021 transfer of $4,750 and the April 7, 2021 transfer of $57,750) that Brenner's conduct constituted a willful default or, at the least, gross negligence.[9] This is because Brenner was on notice by November 10, 2020, *at the latest*, based on the emails discussed above, that Luxe believed that ProVantage was in breach of the Purchase Agreement, that Russo did not have authority to authorize the transfer of any funds on behalf of Luxe, and that Luxe had specifically requested that QPWB "immediately

---

[9]At oral argument, QPWB's counsel suggested that gross negligence could not be established under Alabama law absent evidence of fraud or sexual assault, and urged the court to apply Alabama law rather than the law as stated in the jury charge. *See* Jury Charge (ECF No. 53) at 7 (defining "gross negligence" as "the intentional failure to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another"). But QPWB did not offer its own objections to the proposed jury charge during the charge conference, during trial, or in its present renewed motion for judgment as a matter of law. Moreover, QPWB has failed to point to any authority that would require that, to establish "gross negligence" under Alabama law, ProMED must prove more than an "intentional failure to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another."

cease any attempts to transfer any funds related to this transaction," P. Ex. 19. A reasonable jury could have found that, when Brenner proceeded with the transfers anyway, he willfully defaulted or acted with gross negligence. *Scott*, 306 F.Supp.2d at 1176; *Schaeffer*, 154 So.3d at 986.

Accordingly, to the extent that the jury found that QPWB breached the Escrow Agreement with respect to the February 26, 2021 and April 7, 2021 transfers, the court denies QPWB's renewed motion for judgment as a matter of law and alternative motion for new trial.

## C

Because the court is granting QPWB's renewed motion for judgment as a matter of law with respect to the TR Transfers, it will enter an amended judgment that awards actual damages in the sum of $62,500, which is the total sum of the February 26, 2021 and April 7, 2021 transfers.

## IV

QPWB moves in the alternative for a new trial with respect to its affirmative defenses. QPWB maintains that the verdict in several respects is against the great weight of the evidence and that it established at trial its affirmative defenses of waiver and/or estoppel.

## A

The court begins with QPWB's affirmative defense of waiver. Waiver is defined under Alabama law "as the voluntary surrender or relinquishment of some known right, benefit, or advantage." *Waters v. Taylor*, 527 So.2d 139, 141 (Ala. Civ. App. 1988) (citing

*City of Montgomery v. Weldon*, 195 So.2d 110 (Ala. 1967)).  "[I]t is well established that a party's intention to waive a right is to be ascertained from the external acts manifesting the waiver."  *Id.* (citing *Givens v. Gen. Motors Acceptance Corp.*, 324 So.2d 277 (Ala. 1975)).  "This intention to waive a right may be found where one's course of conduct indicates the same or is inconsistent with any other intention."  *Id.*

QPWB maintains that the great weight of the evidence established that the course of conduct among QPWB, Luxe, and ProVantage "was that Russo would provide the instructions regarding the wires."  D. Br. (ECF No. 57) at 20.  It contends that "Russo—not Reulet—provided all of the information to Brenner about the incoming wires from Luxe—not Reulet.  Thus, when she provided the wire instructions for the outgoing disbursements, this was in line with the parties' course of conduct throughout the transaction."  *Id.* (citations omitted).

ProMED responds that Luxe's conduct concerning the incoming wires of funds could not operate as a waiver because the Escrow Agreement does not provide that QPWB must receive written instructions from Luxe, or provide notice to Luxe, regarding Luxe's own wiring of the Escrowed funds and that "Luxe's conduct in wiring the funds to QPWB is wholly distinct from Luxe's entitlement to provide written instructions, or receive notice, prior to the disbursement of any of the Escrowed Funds."  P. Br. (ECF No. 60) at 13.  The court agrees with ProMED.  In addition, the unrefuted evidence at trial established that Luxe was not aware that QPWB had wired the escrowed funds to T-R Construction until after the T-R Transfers, and that as soon as Luxe discovered that the funds had been transferred, it

acted to protect its rights. This evidence supports the verdict regarding QPWB's affirmative defense of waiver.

QPWB next contends that Luxe waived its right to obtain restitution of its funds when it failed on two separate occasions to request a refund from the manufacturer when the manufacturer asked Luxe if it would like a refund. The court also rejects this ground of QPWB's motion. As ProMED argues in its response, Reulet testified at trial that she did not request a refund because, *inter alia*, she did not believe ProVantage's offer of a refund was genuine. The evidence at trial did *not* show that Reulet failed to request a refund because she was relinquishing her right to recover for breach of the Escrow Agreement. QPWB has not demonstrated "an absolute absence of evidence to support the jury's verdict" with respect to its affirmative defense of waiver. *Siebert*, 851 F.3d at 439. Accordingly the court denies the motion as to this affirmative defense.

B

For largely the same reasons, the court holds that QPWB has not demonstrated that the verdict is against the great weight of the evidence with respect to its estoppel affirmative defense.

To establish its affirmative defense of estoppel, QPWB had the burden of proving that (1) Luxe, with knowledge of the facts, communicated something in a misleading way with the intention that the communication would be acted on; (2) QPWB, lacking knowledge of the facts, relied upon that communication; and (3) QPWB would be harmed materially if Luxe were later permitted to assert a claim inconsistent with its earlier conduct. *EvaBank*

*v. Traditions Bank*, 258 So.3d 1119, 1123-24 (Ala. 2018) (quoting *Gen. Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co.*, 437 So.2d 1240, 1243 (Ala. 1983)).

QPWB contends that the unrefuted trial evidence established that Brenner relied on the parties' prior course of conduct according to which Russo had communicated all of the information concerning the incoming wires from Luxe and Reulet and that Brenner had reasonably relied on that course of conduct when he disbursed the funds to the manufacturer; that Brenner and QPWB will be materially harmed if the court allows ProMED, who is standing in the shoes of Luxe, to change course and now assert claims meant for the defaulting manufacturer against QPWB; that the transaction and disbursement of escrowed funds occurred precisely as the Escrow Agreement anticipated, i.e., the bills of lading were sent before any funds were disbursed; that it was not QPWB's fault that the bills of lading were false; and that ProMED should be equitably estopped from now changing course and taking action inconsistent with its prior conduct in this matter.  The disagrees for the reasons stated above.  The Escrow Agreement outlined in ¶ 4 the procedures for the *disbursement* of funds.  The parties' course of conduct with respect to the *incoming* wire transfers does not necessarily communicate that *outgoing* wire transfers should proceed the same way.  And QPWB does not identify any communication from Luxe or ProMED on which QPWB could have relied with respect to the disbursement of escrowed funds.

QPWB has not demonstrated an absence of evidence to support the verdict with respect to its affirmative defense of estoppel.  *Siebert*, 851 F.3d at 439.  Accordingly, the court also denies the motion for new trial as to this affirmative defense.

- 20 -

V

The court now turns to ProMED's motion for attorney's fees.

A

Alabama follows the "American Rule" regarding attorney's fees, which "generally provides that a prevailing party in litigation is not entitled to an award of attorney fees unless those fees are provided for by statute or by contract or if they are otherwise justified for certain equitable reasons." *Guardian Builders, LLC v. Uselton*, 154 So.3d 964, 970 (Ala. 2014) (citing *Classroomdirect.com, LLC v. Draphix, LLC*, 992 So.2d 692, 710 (Ala. 2008)).[10] ProMED seeks an award of attorney's fees on the ground that they are authorized by recognized principles of "special equity" and by the Alabama Litigation Accountability Act ("ALAA"), Ala. Code Ann. § 12-19-272(a).

B

ProMED contends that it is entitled to an award of attorney's fees by "special equity," that is, "when the interests of justice so require." *Reynolds v. First Ala. Bank of Montgomery, N.A.*, 471 So.2d 1238, 1241 (Ala. 1985) (quoting *Hall v. Cole*, 412 U.S. 1, 5 (1973)).

1

ProMED maintains that, because the jury found that QPWB acted with willful default and/or gross negligence when it breached the Escrow Agreement, ProMED "meets all

---

[10]The Escrow Agreement does not authorize an award of attorney's fees against QPWB.

- 21 -

requirements" to be entitled to recover reasonable attorney's fees and costs.  P. Br. (ECF No. 56) at 4.  At oral argument, ProMED's counsel asserted that the language in the Escrow Agreement limiting QPWB's liability to "losses, costs or damages [that] arise out of the willful default or gross negligence of [QPWB] or its agents," P. Ex. 2 at 2, tracks the Alabama judge-made exception to the American Rule that allows courts, in their discretion, to award attorney's fees "where fraud, willful negligence or malice has been practiced," *Reynolds*, 471 So.2d at 1243; that "willful negligence" is synonymous with "gross negligence"; and that because the jury found that QPWB acted with gross negligence, the court, in its discretion, can award attorney's fees to ProMED under Alabama law.

QPWB responds that the "special equity" exception under Alabama law only applies in extreme cases in which a litigant has acted in bad faith, vexatiously, wontonly, or for oppressive reasons, none of which has occurred here; that ProMED incorrectly attempts to conflate the heightened contractual standards of willful default or gross negligence required under the Escrow Agreement to the type of malice, fraud, or bad faith that is required for the "special equity" exception to apply; that QPWB has not acted fraudulently, with malice, or in bad faith but, instead, "has only ever acted reasonably to defend itself in this litigation" and "only did what it was supposed to do under the Escrow Agreement," D. Br. (ECF No. 58) at 5; and that QPWB did not ignore any court orders in this litigation, unduly protract or extend the litigation, or otherwise engage in malicious conduct during these proceedings.

2

"Alabama's special-equity exception is somewhat narrow in its scope and application," *Allen v. USAA Casualty Insurance Co.*, 577 F.Supp.3d 1279, 1284 (N.D. Ala. 2022) (citing cases), and has been used to award attorney's fees "when a defendant has committed fraud, willful negligence, or malice or otherwise has acted in bad faith." *Foster v. Foster*, 304 So.3d 211, 221 (Ala. 2020). In *Reynolds* the Supreme Court of Alabama reversed the trial court's denial of attorney's fees based on evidence of such behavior, including

> that the [defendant] concealed the existence of its own written investment standards, violated its own written minimum standards of safety, attempted to conceal the holding of [REITs] under the heading of insurance, and attempted to conceal the fact that it had sold Associated Coca-Cola stock at a loss in January 1975 by lumping the sale of this stock with the sale of 1,000 shares of a parent company Coca-Cola stock.

*Reynolds*, 471 So.2d at 1243.

Courts applying the "special equity" exception in the wake of *Reynolds* have similarly required conduct, either before or during the litigation, that is more egregious than what occurred in this case: i.e., gross negligence or willful default on a contract. For example, in *King Development & Realty, Inc. v. Eslami*, 964 So.2d 51, 57-58 (Ala. Civ. App. 2007), the Alabama Court of Civil Appeals upheld an award of attorney's fees based on evidence that the defendant "maliciously and in bad faith" refused to accept rent payments from its tenant, with the intent to declare the tenant in default and terminate the lease "so as to gain possession of the valuable refrigeration equipment that the tenant had installed on the leased

premises." Several years later, in *Leonard v. Woodruff*, the Alabama Court of Civil Appeals upheld an award of attorney's fees "for unnecessarily relitigating . . . matters that had previously been decided and/or that could have been decided in previous Alabama proceedings." *Leonard v. Woodruff*, 204 So.3d 901, 905 (Ala. Civ. App. 2016). Most recently, in *Foster v. Foster*, 304 So.3d 211, 221 (Ala. 2020), the Supreme Court of Alabama held that the trial court justifiably awarded attorney's fees against a trustee who had engaged in "misfeasance of his fiduciary duties," failed to cooperate with court-ordered accounting, and unduly protracted the litigation.

Although ProMED is correct that the Supreme Court of Alabama has included "willful negligence" in the list of conduct that may permit a trial court, in its discretion, to shift attorney's fees to the successful party, the Alabama courts, in practice, have not awarded attorney's fees under the "special equity" exception absent a showing of fraud, bad faith, maliciousness, or a clear disregard of court orders. QPWB's conduct in relation to the Escrow Agreement is not the type of extreme conduct—fraudulent, malicious, or bad faith in nature—that is required to award attorney's fees in "special equity" under Alabama law.

Accordingly, the court declines, in its discretion, to award attorney's fees under Alabama's "special equity" exception.

C

ProMED next seeks attorney's fees under the ALAA, which provides:

> Except as otherwise provided in this article, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any

- 24 -

> other costs otherwise assessed, reasonable attorneys' fees and
> costs against any attorney or party, or both, who has brought a
> civil action, or asserted a claim therein, or interposed a defense,
> that a court determines to be without substantial justification,
> either in whole or part.

Ala. Code Ann. § 12-19-272(a).  Section 12-19-273 states that, "[i]n determining the amount of an award of costs or attorneys' fees, the court shall exercise its sound discretion."  As a prerequisite to awarding attorney's fees under the ALAA, the court must find that the claim or defense is asserted "without substantial justification."  *McArdle v. Bromfield*, 540 So.2d 91 (Ala. Civ. App. 1989).  The statue also provides a non-exclusive list of factors that the court can consider in determining whether to award attorney's fees and costs.

ProMED argues in its motion that QPWB stipulated to the facts that established that it breached the Escrow Agreement but still presented affirmative defenses of waiver and estoppel to the jury; that QPWB conducted no investigation into its affirmative defenses before or after asserting them in its answer and thus made no effort to determine the validity of its defenses before asserting them or presenting them to the jury; that QPWB did not attempt to develop its defenses at trial and did not even discuss them during closing argument; and that "[t]hese facts suggest that these defenses are frivolous, groundless in fact, and/or that QPWB asserted these defenses in bad faith or without a proper purpose," P. Br. (ECF No. 56) at 6.  The court disagrees.

The Supreme Court of Alabama has held that "[t]he clear terms of § 12-19-271(1) require that for an action, claim, or defense to be 'without substantial justification' it must be either 'frivolous,' 'groundless in fact,' 'groundless in law,' 'vexatious,' or 'interposed for

any improper purpose.'" *Pac. Enters. Oil Co. (USA) v. Howell Petroleum Corp.*, 614 So.2d 409, 418 (Ala. 1993). Although QPWB did not prevail on its affirmative defenses, they were not so lacking in merit as to be frivolous, groundless in fact, groundless in law, vexatious, or interposed for any improper purpose. And ProMED has failed to demonstrate that QPWB pursued its affirmative defenses in bad faith or with malicious intent. Accordingly, the court, in its discretion, declines to award attorney's fees under the ALAA.

D

The court now turns to ProMED's motion for $3,461.23 in costs.

> [C]ourt costs are distinguishable from attorney fees. The American rule applied in Alabama generally prohibits a losing party from being ordered to pay the attorney fees incurred by the prevailing party, but the American rule does not prohibit an award of court costs to the prevailing party. In practice, such awards are commonplace and specifically authorized by Rule 54(d), Ala. R. Civ. P., which provides that, "[e]xcept when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs."

*Guardian Builders, LLC v. Uselton*, 154 So.3d 964, 973 (Ala. 2014) (some citations omitted).

Even though the court is today entering an amended judgment that awards ProMED only some of the relief it seeks, ProMED is still the prevailing party. And QPWB does not contend that ProMED's request for costs is unreasonable. Accordingly, the court grants ProMED's motion and awards $3,461.23 in costs.

\*    \*    \*

Accordingly, for the reasons explained, the court grants in part and denies in part QPWB's renewed motion for judgment as a matter of law; denies QPWB's alternative motion for new trial; denies ProMED's motion for attorney's fees and grants ProMED's motion for $3,461.23 in costs.[11]  The court is entering an amended judgment in favor of ProMED in the principal sum of $62,500 in actual damages, prejudgment interest, $3,461.23 in costs (minus any taxable costs of court included in this amount), taxable costs of court, as calculated by the clerk of court, and post-judgment interest.

**SO ORDERED**.

October 1, 2025.

SIDNEY A. FITZWATER
SENIOR JUDGE

---

[11]The costs awarded are non-taxable costs that are not intended to duplicate any taxable costs of court calculated by the clerk of court.  Accordingly, to the extent that ProMED has included taxable costs of court in its request for $3,461.23 in costs, the court declines to award them so as to avoid a duplicate recovery.